Good morning ladies and gentlemen. We have just one case for this morning and I want to check first and make sure that Judge Rovner is on the speakerphone. Judge Rovner can you hear us? I can, good morning. Good morning. So there are actually three of us here not two, you just have to listen carefully. So our case for this morning is Todd v. Roberson and Mr. Gagin. Good morning Your Honors, Martin Gagin from Winston & Strawn on behalf of the is whether Mr. Todd's guilty plea was rendered involuntary under Strickland v. Washington and his progeny when he relied on his counsel's erroneous advice that the state had agreed to a 10-year sentencing cap. Instead, Mr. Todd was ultimately sentenced to 25 years in prison or two and a half times the maximum amount, sentencing amount erroneously advised by Mr. Todd's counsel. So Mr. Gagin, I understand the difference between the question whether there was such an agreement for the 10-year cap and what Mr. Todd's impression was or the impression conveyed by counsel and I also understand that the state court spent more time talking about whether there was such agreement but the state court also, as I read it, finds that he didn't think there was an agreement like that, that he told the state judge during the colloquy that there were no promises, that there was nothing to believe, that he wasn't aware of the significance of this. So given the deferential standards we apply, how can we rule for you? Sure, Your Honor. Two points. First, with respect to the Illinois Appellate Court's decision, Your Honor is right that certainly the court spent more time discussing almost exclusively the negotiations between Mr. Raghdagavich, Mr. Todd's counsel, and the state and did not analyze the specific communications between Mr. Raghdagavich and Mr. Todd. Specifically, the testimony from both Mr. Todd and Mr. Raghdagavich is that on the day before the plea hearing on February 24, 2008, Mr. Raghdagavich specifically advised Mr. Todd that the state had in fact entered into a 10-year sentencing cap and Mr. Raghdagavich- But are you swimming upstream here? Because I'm not sure that the state court's findings of fact support you. The state court thought that this was sort of a preposterous story actually, that there was this secret cap of which there was no evidence in writing and that there was a deliberate refusal to tell Mr. Murray what was going on. The state court finds all of this a lot to swallow. Well, it is true the state court was skeptical of Mr. Raghdagavich's testimony, but the issue with the Illinois Appellate Court's decision, it did not specifically analyze the communications between Mr. Raghdagavich and Mr. Todd. Rather, it simply analyzed the communications between Mr. Raghdagavich and the state and determined that there was insufficient evidence and proof that a 10-year sentencing cap actually existed. And then the court- Yes, but forgive me, but doesn't the opinion recite the trial court's findings that Mr. Murray went over the open plea terms with Mr. Todd and that Todd was not credible concerning the existence of the 10-year cap so that it seems to me that the Illinois Appellate Court's determination that no 10-year cap existed would be an acceptance of the findings of the trial court. Can you help me with that? Yes, I can, Your Honor. You've actually come to the rub of the issue here. Specifically, if you actually look at the Illinois Appellate Court's decision, specifically paragraph 11 on RSA 11, the court specifically mentions in passing Mr. Raghdagavich's testimony, specifically his testimony that he advised Mr. Todd the day before the sentencing, the plea hearing, that the state had in fact agreed to a 10-year cap. But- But the state hadn't. I'm sorry. Hadn't agreed. Yeah, but in the actual- Why would it agree? I'm sorry, Your Honor? What incentive did the state have to agree to a 10-year limit? What was it going to get in return? Why did it do it? Well, in terms of- In fact, it didn't do it. But why would anyone think that it would agree to a 10-year ceiling on a sentence? Well, respectfully, Mr. Todd thought that there was a 10-year sentencing cap because- But I thought the reason- Answer my question, would you please? Sure. What was the incentive of the state? Yeah, what's the quid pro quo, right? Well, obviously to resolve the matter, it was- Oh, but come on. No, but it was cooperation, right? You know, he was going to give cooperation. Yes, certainly, Mr. Todd was out from jail cooperating with the government. And actually, if you take a look to answer Your Honor's question directly, if you actually take a look at the plea negotiations- Don't these people get let out halfway through their sentence? Do they get let out halfway? Yeah. Sometimes that occurs, certainly. Sometimes? Yes. So it was routine? It occurs sometimes, yes. Yeah. Sure. Why would anyone think five years was an adequate prison term for him? Not five years, 10 years, Your Honor. No, but if they let him out after half his term is served, that's five years. Sure. Now, there's something in there about how he or Donovitz, whatever it was, was going to suggest a lighter sentence in exchange for a heavier fine. Now, did that go anywhere? No, Your Honor. Specifically, in terms of the plea hearing, all Mr. Todd was aware of was what he was told the day before. In terms of the actual plea negotiations, the way it went down went from 18 years to 15 years. I'm asking you about the fine. Yeah, I know. Is there some sort of idea that the lighter sentence could be compensated for by a fine? Yeah, well, specifically, the bond conditions were reduced at the hearing. I'm not talking about a bond. I'm talking about a fine. No, I'm not aware of specific lowering of the fine in connection with any plea negotiations. Well, it's in the record that that was a suggested deal, a lower sentence for a higher fine. Right. I'm just curious what that higher fine was. Yeah, that wasn't discussed at the February 25th, 2001. With money that he can pay heavy fines? No, not that I'm aware of, Your Honor. Well, what was the point of that discussion, then? With respect to the fine itself? Yes. There wasn't any... The notion of trading a higher fine for a lower sentence. What was that about? He doesn't have money for a higher fine. Yeah, I'm not aware of any specific discussion of that. Well, it's in the record that there was a suggestion that the higher fine would substitute for the longer sentence. Right. In terms of the actual record evidence, I'm not aware of that having any specific influence on Mr. Todd in deciding whether to plead guilty on February 25th, 2008. The facts reveal that both Mr. Ragnacovic and Mr. Todd... Wasn't he determined to plead guilty? He didn't want to go to trial. No, Your Honor. Actually, as a matter of fact, what he testified under oath... It's important to realize that this case, unlike a lot of other ineffective assistance cases, this isn't a case where the lawyer is saying one thing and the defendant is saying one thing. Both Mr. Ragnacovic and Mr. Todd testified the same, that specifically he was advised the day before he pled guilty that, in fact, the 10-year sentencing agreement had been reached. And so he went into the court hearing the following day with that understanding in mind. And he specifically... That may all be true, but I have a different problem, which is just that building up inferences, if there was, in fact, no such agreement, which is the finding of the state court, then it seems to me it makes it less likely that the lawyer ever would have said such a thing to Mr. Todd and less likely that Mr. Todd would have relied on that and also more likely that what Mr. Todd told the state court, which is mentioned in that same paragraph 11 to which you referred, that he admitted telling the court that he was not promised anything other than the terms of the plea agreement, which did not include a 10-year cap because they review at that portion of the proceedings what's in the agreement. And it's the reduction of his bond to $20,000 so that he can pay up 2,000, which he has, and get out. He's going to be cooperating with this task force and doing that sort of thing. So there's some modest things that are there that he's getting in exchange. And it just strikes me, putting those pieces together, a rational person could think that he was not told about any 10-year cap and that didn't drive the plea. So my white light is on, but if I can answer Your Honor's question first? Sure. Yeah. In terms of, it is true, Your Honor, that Mr. Todd specifically responded no when he was asked whether he was promised anything other than the actual terms of the plea agreement. But again, two key facts here. One, he went into the plea hearing specifically advised that there was, in fact, a 10-year sentencing cap. And so that was his mindset. Well, isn't that a fact question? I mean, I understand you believe him, but isn't that a fact question? Well, it's not so much a fact question because the actual Illinois Appellate Court, again, if you actually go to the actual ruling of the court, it didn't specifically analyze the communications, which on the strict one, the touchstone for any ineffective assistance are communications between the defendant and his counsel. And the Illinois Appellate Court's analysis was solely focused on the communications between the defendant and the state. Okay. Well, if you want to save a minute. Yes, I'll save my rebuttal time. What were you asking for? You should answer, Judge. I'm sorry, Your Honor. You were asking for a way of relief. That his guilty plea be vacated. So he can have a trial? Yes. Thank you. Thank you, Mr. Gagin. Okay. Mr. Meyer. Good morning, Your Honors. May it please the court, counsel. I am Drew Meyer of the Illinois Attorney General's Office. I represent the appellee, Warden Roberson. This court should affirm the district court's judgment because the state appellate court reasonably applied strickland within the meaning of 2254 D1 in holding that no prejudice resulted from Mr. Radakovich's alleged promise to petitioner that the state had agreed to a 10-year sentencing cap. Now, of course, if Mr. Todd had been misled by Mr. Radakovich as to the existence of a 10-year cap, how could that not be prejudicial, given that there was a 15-year cap on the table that he could have considered? Your Honor, first of all, there is ample evidence to support the state court's finding that petitioner did not so rely, did not rely on that promise. But as this court held in Bethel versus United States, when it could not determine whether the attorney's performance had been unreasonable, the plea colloquy has a curative effect such that it can counter bad advice that the attorney provided previous to the colloquy. So in this case, there was an unambiguous plea colloquy in which this 10-year sentencing agreement was never mentioned. All the other terms of the plea agreement were itemized on the record at least twice. And petitioner stated unequivocally that he had not been promised anything other than a bond reduction and the dismissal of another case pending against him. So in summary, there's ample evidence to support the finding that petitioner did not rely on this promise, that he was not made this promise by his attorney. But even if he was under Bethel versus United States, the plea colloquy would have erased any prejudice that he might have suffered. So there I have a question for you because I don't see the state court really grappling with one piece of Mr. Rudakovich's testimony. Namely, after the plea is taken, there's a period of time that passes. And then they start talking about sentencing. And Mr. Rudakovich writes to Mr. Spencer, would the state be interested in a sentence lower than the 10-year sentence that has been negotiated in consideration for a higher fine in this matter? That's what Judge Posner was talking about. And then Mr. Spencer says, hey, there's no 10-year agreement. But why in the world would Mr. Rudakovich have come up with that if there hadn't been an agreement? And how do we factor that in? To all of these considerations. I would be speculating as to Mr. Rudakovich's thought process regarding his alleged impression that he had reached this 10-year agreement with the state. Well, he says, I mean, his letter indicates that that's what he thinks. I guess that's what I'm assuming. Why he thinks that, I guess you're saying you don't know. But he does think it. He appears to think that. He certainly presents it. His question to State's Attorney Spencer implies that this agreement has been reached. But that exchange actually supports the state court's finding that no such agreement was ever reached. Because Spencer, within an hour of receiving this communication, incredulously replies, 10 years. Petitioner pleaded open 6 to 60. So and another thing, Your Honor, is, especially in the context of Strickland, when we're gauging what the attorney did at the relevant time, not later on. The relevant time here is when Petitioner pleaded guilty on February 25, 2008. At that time, all the documentary evidence, as well as the thorough and credible, as the state court found it, testimony of Thomas Murray, shows that no one was under the impression that a 10-year sentencing agreement was in place. The 10-year sentencing agreement was not. So Mr. Ratajkowicz. Well, of course, Mr. Ratajkowicz has decided that he didn't want Mr. Murray to know about the 10 years because of possible conflict with others involved in these drug deals. Yes, Your Honor, he did. And the district court specifically found that testimony disingenuous. Did not believe, and stated rightly, that that excuse made no sense. It made no sense for a variety of reasons, one of which was that he thought that Mr. Ratajkowicz testified later on at a hearing, one of two evidentiary hearings that Petitioner was afforded in state court, that the reason he didn't inform Mr. Murray about the chimerical 10-year sentencing cap was that he was afraid that Thomas Murray would catch on that Petitioner was cooperating with law enforcement. Right. This Blackhawk. The Blackhawk task force, Your Honor. Task force. Yes, which I believe is aimed at suppressing drug trade. But, Your Honor, Petitioner's mandated cooperation with the Blackhawk task force was itemized as an element of his plea deal at the plea hearing. This was not a secret from anyone. In fact, when Thomas Murray testified, he said, stated numerous times that after his conversation with Mr. Ratajkowicz prior to the sentencing hearing, or the plea hearing, excuse me, that he understood that part of this plea deal included Petitioner's cooperation with law enforcement. That's because this man that is named in the plea colloquy was known to be a member of that task force? Yes, Your Honor, Alejandro Shavira. Right, Shavira. Yes, and Thomas Murray was familiar with him, knew he was law enforcement, and again- I mean, not just law enforcement, the Blackhawk task force. Yes, Your Honor. Yes, Your Honor. In your brief, you refer to Ratajkowicz's discredited testimony. What do you mean by that? Your Honor, I was referring to the trial court's credibility determination, where he found Ratajkowicz's testimony regarding his reasoning for not sharing the 10-year agreement with Mr. Murray as disingenuous. So I thought it was entirely- Did Ratajkowicz testify that there was such an agreement? Yes, Ratajkowicz testified that there was such an agreement- With Spence? With whom? Yes, Your Honor, that such an agreement did exist between him and State's Attorney Spencer. On cross-examination, he acknowledged that State's Attorney Spencer had not actually affirmatively ever agreed to the 10-year sentence. So in other words, Ratajkowicz had proposed the 10-year cap to Spencer, and Spencer hadn't responded? That was Ratajkowicz's testimony specifically regarding their phone conversations on February 21, 2008. Well, that's where he's trying to say that because Spencer never says no, he thinks Spencer means yes. That was Ratajkowicz's testimony, Your Honor. Ratajkowicz says that. But belying the notion that Ratajkowicz could have believed they reached such an agreement are the February 22, 2008 letters between the two counsel, which state the terms of the plea agreement as it was read into the record at the plea hearing, and those letters that purport to memorialize the February 21, 2008 conversations make no mention of this 10-year agreement, which, again, belies the notion that Ratajkowicz or anyone else, petitioner especially, could reasonably have believed that this was part of the plea deal. But Spencer did at one point put 15 years on the table, didn't he? Yes, Your Honor. And that got swept away somehow in all of this. He would have been a lot better off with 15 than 25, I guess. Indeed, Your Honor, indeed. That's absolutely true. And regarding that 15-year offer, it's worth noting that in response to Mr. Ratajkowicz's request for a 10-year cap, State Attorney Spencer responds that he would, in his view, he would not be doing his job to offer less than 15. So that indicates that that 15-year offer was a hard floor. Did Ratajkowicz testify that Spencer actually agreed that they shook hands or something over the 10-year agreement? No, Your Honor. Was it he interpreted Spencer's silence as agreement? That appears to be what Mr. Ratajkowicz testified to. Yes, that he inferred from his silence after Mr. Ratajkowicz purportedly requested this deal, that he inferred from that silence that the deal was made. It seems as though my time is up. If there are no further questions, we would ask this Court to affirm the judgment of the District Court. Thank you. All right. Thank you, Mr. Meyer. Anything further, Mr. Gagin? Yes. He can have a full minute. Yes, Your Honor. Two quick points on rebuttal. Respondent mentioned that there was, quote-unquote, ample evidence that petitioner did not rely on this 10-year sentencing cap, but Respondent only referred to Mr. Todd's negative response during the plea colloquy. To the contrary, the record demonstrates that Mr. Todd specifically testified in his sworn rely on Mr. Ratajkowicz's advice the day before his plea hearing that, in fact, this 10-year sentencing agreement was reached with the State. And secondly, just with respect to the plea colloquy, just as in Moore v. Ryan, I mean, the Respondent attempts to portray this plea hearing as some type of thorough and exhaustive recitation of the terms of the plea agreement. We actually look at the plea transcript. There was a very brief discussion of the terms of the plea agreement, spanning two paragraphs and 163 words, and followed by nine rote questions in which Mr. Todd just simply said, no, throughout. Why should we assume that the plea agreement wasn't, even if briefly done, a comprehensive review of the key terms? Certainly, a 10-year cap would have been a key term, no doubt about it, and it's not mentioned. So why isn't the rational assumption that there was no such thing? Well, because, again, here we have specific testimony from both Mr. Ratajkowicz and Mr. Todd specifically concerning the advice given the day before. So Mr. Todd went into his plea hearing specifically believing this 10-year sentencing cap had been entered into. The plea agreement was repeatedly referred to as a limited plea agreement. He testified that his understanding, again, based on his counsel's advice the day before, which we now know was erroneous, referred to this 10-year sentencing cap. And this brief description, these nine questions, did not disabuse him of that view, just as any more important. Well, do you think there was an agreement, or simply that Todd was misled? Well, we now know that the state disagreed with Mr. Ratajkowicz's position that there was a state, but clearly— So you're saying Todd was misled. Yes. Which was the ineffectiveness. Yes. Yeah. I see my time is up. All right. Well, thank you very much, and we appreciate your taking the appointment from the court. It's a great assistance to the court. Thanks as well to the state. We'll take the case under advisement, and that concludes today's session.